IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |
|---|---|
| | : |
| DORN B. HOLLAND | |
| | : |
| v. | : Civil Action No. DKC 2004-3581 |
| | : |
| WASHINGTON HOMES, INC. | |
| | : |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Title VII discrimination case are:  (1) Defendant's motion for summary judgment (paper 14); (2) Plaintiff's motion for an extension of time to complete discovery (paper 16); (3) Plaintiff's motion for leave to file an amended complaint (paper 23); and (4) Defendant's motions to strike (papers 29, 30, and 34).  The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the reasons that follow, the court will grant Defendant's motion for summary judgment, deny Plaintiff's motion to extend the discovery deadline, deny Plaintiff's motion for leave to file an amended complaint, and deny two of Defendant's motions to strike as moot, but grant the third.

I.  **Background**

The following facts are undisputed except where noted, and are presented in the light most favorable to Plaintiff.  Plaintiff Dorn B. Holland is an African-American male who worked as a community sales manager for Defendant Washington Homes, Inc., from October 31, 1998, until he was terminated on or about October 30, 2003.

Plaintiff's income consisted of a base salary plus a commission of one percent for each sale.

Plaintiff's first assignment was to sell homes at Fairfield Commons; he worked there through January or February of 2001. Fairfield Commons is a predominately African-American community with a stigma for crime. He sold 89 of 91 homes and was chosen as Rookie of the Year in 2000 due to his success.

In March 2000, Plaintiff met with his supervisor, Didi Peck, a Caucasian company vice president, to complain about a Caucasian community sales manager, Joseph Macco, "raiding" his customers who were under contract. Around that time, Plaintiff was forced to split his commissions with Mr. Macco, but was denied the same opportunity when he requested a commission split on Mr. Macco's sales. In January or February of 2001, he was told he could not put a lock box on two Fairfield Commons units, which would allow him to earn commissions when the units were sold, but learned that Mr. Macco was allowed to use lock boxes.

Plaintiff was next assigned to Winterset, where he worked from February 2001 to June 2001. In his deposition, Plaintiff testified that Ms. Peck transferred him to Winterset because of his race. Moreover, about the time of his transfer, Defendant raised Winterset's home sales prices by $40,000. Plaintiff stated that Ms. Peck placed him at Winterset knowing it would be difficult to sell the homes with the $40,000 increase. He also stated that the

2

builder was offering a discount promotional program that initially was not made available to him.  Plaintiff further contends that Ms. Peck gave Carla Temple, the Caucasian community sales manager who replaced him at Winterset, incentives that he did not receive.

> She gave me a set amount of homes to sell and only specific home sites.  She increased the sales price $40,000 on day one, but she offered Ms. Temple 25, at least $2,500 more in closing monies.  She allowed Ms. Temple to take offers on homes, as she had not allowed me.  And she allowed Ms. Temple to sell the homes at random, from all of the home sites that were available.

(Paper 14, ex. 1, Holland dep., 86).

Plaintiff's next assignment was Arbor West, where he worked from July 2001 to September 2001.  He testified that the Arbor West assignment was discriminatory because a Caucasian sales manager, Cliff Martin, who had been transferred from Arbor West to Perrywood, was allowed to continue selling at Arbor West for a week after the assignment.  Plaintiff said he asked to go to Perrywood, a more lucrative community, while Mr. Martin continued to sell homes at Arbor West, but was denied the opportunity.[1]

In September 2001, Plaintiff was assigned to Kingsview, which he felt was not a favorable assignment because it required more out-of-pocket expenses in terms of transportation, was not as lucrative, and had only nine homes left to sell.  In November 2001,

---

[1] From the testimony, it appears Plaintiff was unable to sell homes during that week.

3

Plaintiff sought to participate in a sales incentive in which employees could win a free trip if they sold enough homes. Plaintiff said he was denied the trip even though he sold eight homes, two more than the minimum number Ms. Peck told him he needed to sell.

In January 2002, Plaintiff learned his next assignment would be Robinswood.  He maintains this assignment was discriminatory because Ms. Peck had tried several times to give the Robinswood assignment to a Caucasian sales manager, Ruby James, who turned down the assignment.  In April 2002, Ms. Peck refused to sign Plaintiff up for a class offered by the National Association of Home Builders; Plaintiff asked another vice president to sign him up.[2]  Plaintiff also testified to an incident in March 2003 in which Hugo DeCesaris, the president of Washington Homes, walked into the lunch room and asked him to make a pot of coffee in front of his co-workers.

In early September 2003, Ms. Peck told Plaintiff his next assignment would be Hamlin Park.  Plaintiff expressed concern that Hamlin Park was a blighted community.  Ms. Peck assured him Hamlin Park was ready to be sold, it was "quick money," and his next community would be Forestville.  When Plaintiff went to view Hamlin

---

[2] Plaintiff alleged in his complaint that after he completed the class, Ms. Peck refused to allow him to put the CSP designation on his business cards, but allowed Caucasian sales managers to do so.  (Paper 1, ¶ 11).  Plaintiff has offered no evidence with respect to this allegation.

Park, the community was not ready or open.  Around the same time, Ms. Peck assigned Mr. Macco to Winshire Estates, which Plaintiff believed was a more attractive assignment.  Plaintiff believed Ms. Peck had used "subterfuge" to give Mr. Macco Winshire Estates and to give him Hamlin Park.

On September 1, 2003, Plaintiff met with Edward Kaplan, human resources vice president, to discuss his problems with Ms. Peck. Plaintiff questioned whether he was experiencing racial discrimination.  On September 3, 2003, Plaintiff met with Human Resources Manager Gretchen Leftrict to discuss his concerns about racial discrimination.  On September 8, 2003, Plaintiff, Ms. Peck, and Ms. Leftrict held a meeting, which ended with Ms. Leftrict telling Plaintiff and Ms. Peck to go to Hamlin Park together so Ms. Peck could show Plaintiff why the community was ready to sell and would be lucrative.

On September 16, 2003, Plaintiff met with Mr. DeCesaris. Plaintiff expressed concern that Hamlin Park was blighted and overpriced and that his salary was "being depressed."  Plaintiff testified that Mr. DeCesaris gave this response:

> [W]ell, go – look, I mean, you know those people.  You sold that kind of community before.  And I said I know those people, what do you mean by I know those people? Like I said, you've sold that type of community before, you had Fairfield, you did well there. And I said, are you saying that the Winshire Estate opportunity was never available to me?

> He said, well, look, we put Joe where we put
> Joe, because we envision him being there.  We
> put you where we put you, because that's what
> we had for you.

(Paper 14, ex. 1, Holland dep., 169).

On October 30, 2003, Plaintiff met with Ms. Leftrict to look
at his personnel file and to make copies.  During the meeting, Ms.
Leftrict told Plaintiff that Ms. Peck had filed a formal charge
against him alleging that he had made violent threats against her,
and therefore he was being terminated immediately.   Plaintiff
denied threatening Ms. Peck and said this was retaliation.[3]

With respect to Plaintiff's termination, Defendant contends
that Plaintiff was fired because he made threatening remarks about
Ms. Peck.[4]   Ms. Leftrict began an investigation on October 24,
2003, after Maura Arndt, another vice president, expressed concerns
about Ms. Peck's safety.  During the investigation, Ms. Leftrict
obtained sworn statements from Ms. Arndt and Brenda West, Ms.
Peck's administrative assistant, in which they stated that
Plaintiff had made threatening statements about Ms. Peck.[5]   Mr.

---

[3]   On November 3, 2003, he was told that his end date was
changed to November 3 so that his 401K plan would reach maturity
When Defendant fired Plaintiff, he was one day short of his five-
year anniversary.

[4]   Although disputed facts are viewed in the light most
favorable to Plaintiff, the court provides Defendant's version for
purposes of analysis.

[5]   Defendant did not provide the original statements in its
motion for summary judgment.  Instead, Defendant provided "summary
(continued...)

DeCesaris stated in an affidavit that he decided to fire Plaintiff during an October 30, 2003, meeting after learning of the threat allegation and hearing about Ms. Leftrict's investigation.

Plaintiff filed a charge of discrimination with the Prince George's County Human Relations Commission and the United States Equal Employment Opportunity Commission ("EEOC").  On August 26, 2004, the EEOC issued a right-to-sue letter.  Plaintiff filed a lawsuit against Washington Homes, Inc./K. Hovnanian Company on November 8, 2004, pursuant to Title VII of the Civil Rights Act of 1964 and 1991, 42 U.S.C. § 2000 *et seq.*[6]

## II.  Motion to Extend the Discovery Deadline and Motion For Leave to File an Amended Complaint

On May 6, 2005, Plaintiff filed a motion to extend the discovery deadline until July 6, 2005.  (Paper 16).  Defendant opposed the motion, arguing that the request is out of time based on the Scheduling Order.  (Paper 18).  Similarly, on May 13, 2005, Plaintiff filed a motion for leave to amend his original complaint, asserting lack of knowledge of certain facts when he filed his complaint.  (Paper 23).  Defendant opposed this motion as well on the basis that the motion is time barred.  (Paper 25).

---

[5](...continued)
statements" that were dated August 2004, after Plaintiff was fired. (Paper 14, ex. 6).

[6] On December 8, 2004, the parties stipulated that the claims against "K. Hovnanian Company" be dismissed.

**A. Motion to Extend the Discovery Deadline**

The Scheduling Order set April 20, 2005, as the deadline for discovery.  (Paper 9).  Plaintiff requested an extension stating that "[a]s of the writing of this Motion counsel for the Plaintiff has not received the Scheduling Order, electronically or via mail." (Paper 16, at 2).  He further stated that an extension would not prejudice Defendant.  *Id.*

Plaintiff's request implicates Federal Rule of Civil Procedure 16(b), which states "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge . . . ." Rule 16(b)'s "good cause" standard focuses on the timeliness of the amendment and the reasons for its tardy submission.  Because a court's Scheduling Order "'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril,'" *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc*., 190 F.R.D. 372, 375-76 (D.Md. 1999) (quoting *Gestetner v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D.Me. 1985)), a movant must demonstrate that the reasons for the tardiness of this motion justify a departure from the rules set by the court in its Scheduling Order.

The primary consideration for the Rule 16(b)'s "good cause" standard is the movant's diligence.  Lack of diligence and carelessness are "hallmarks of failure to meet the good cause standard." *W. Va. Hous. Dev. Fund v. Ocwen Tech. Xchange, Inc.,* 200 F.R.D. 564, 567 (S.D.W.Va. 2001).  "[T]he focus of the inquiry

8

is upon the moving party's reasons for seeking modification.   If that party was not diligent, the inquiry should end." *Marcum v. Zimmer*, 163 F.R.D. 250, 254 (S.D.W.Va. 1995).

Plaintiff contended that he did not receive the Scheduling Order.   Rule V.A of the Electronic Filing Requirements and Procedures manual states that "[e]lectronic filing by the court or court personnel of any orders, decrees, judgments or proceedings of the court shall constitute entry on the docket as well as notice to and service on registered users in the case, under the Federal Rules of Civil Procedure."   Electronic Filing Requirements and Procedures (Aug. 11, 2003), *available at* www.mdd.uscourts.gov.   By registering to use electronic filing, Plaintiff's counsel consented to receiving electronic service.   *See id*. at II.A.3.   Plaintiff's assertion – some six months after he filed his complaint – that he did not receive the Scheduling Order despite the fact that it was docketed December 6, 2004, shows a lack of diligence, and consequently a lack of good cause.   Accordingly, the court will deny Plaintiff's motion to extend the discovery deadline.

### B.   Motion to Amend the Pleading Deadline

The Scheduling Order set January 20, 2005, as the deadline for amendment of pleadings.   (Paper 9).   Plaintiff's motion for leave to amend his complaint triggers both Federal Rule of Civil Procedure 15(a), governing amendments to pleadings, and Rule

16(b).[7]   The standards for satisfying the rules are at odds.  Rule 15(a) states in pertinent part that "leave shall be freely given when justice so requires," while Rule 16(b) states that "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge . . . ."

Neither the Fourth Circuit nor the Supreme Court have dealt decisively with the interplay of these two rules when the plaintiff seeks a motion to amend its complaint after the Scheduling Order's deadline has passed.  However, one district court in the Fourth Circuit set up a two-step analysis:

> Once the scheduling order's deadline for amendment of the pleadings has passed, a moving party first must satisfy the good cause standards of Rule 16(b).  If the moving party satisfies Rule 16(b), the movant then must pass the tests for amendment under 15(a).

*Marcum v. Zimmer*, 163 F.R.D. 250, 254 (S.D.W.Va. 1995); *see also Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992) (applying two-step analysis to deny motion to amend for lack of good cause).

As discussed previously, Rule 16(b)'s "good cause" standard focuses on the timeliness of the amendment and the diligence of the moving party.  Plaintiff has not specifically requested a modification of the Scheduling Order.  Instead, Plaintiff has filed

---

[7] Even if Plaintiff's first attempt to amend his complaint on May 9, 2005, had been successful, the motion would still have been filed after the Scheduling Order's deadline.

a motion to amend his complaint in which he asserts:  "At the time
plaintiffs [sic] complaint was filed, plaintiff Holland was
ignorant of certain relevant facts that are important to enable
plaintiff Holland to maintain plaintiff's complaint.  Because the
facts came into possession after the filing of the complaint,
plaintiff Holland was unable to allege them in plaintiff's original
complaint." (Paper 23, at ¶ 2).  Plaintiff also asserts that "the
new facts contained in plaintiff's amended complaint are necessary
to enable plaintiff to prove plaintiff's cause, and therefore the
amendment sought is in furtherance of justice."  *Id.* at ¶ 4.

     Plaintiff's motion does not establish good cause.  Plaintiff
has not stated *what* new information has surfaced, *when* the
information surfaced, or *why* the information was not available to
Plaintiff sooner.  Plaintiff also fails to address why he filed the
motion more than three months after the Scheduling Order deadline
passed and after Defendant filed its motion for summary judgment.
Accordingly, Plaintiff's motion for leave to amend will be denied.
*See Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D.Md. 2002)
(denying the plaintiff's motion for leave to amend her complaint
when the plaintiff failed to provide reasons for her tardiness and
stating "it would behoove Plaintiff to provide the Court with some
basis on which to judge good cause"); *see also Odyssey Travel
Center, Inc. v. Ro Cruises, Inc.*, 262 F.Supp.2d 618, 632 (D.Md.
2003).

### III.  Standard of Review For the Motion for Summary Judgment

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1987).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential

element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## IV.  Analysis

There are two methods for proving intentional discrimination in employment:  (1) through direct or indirect evidence of intentional discrimination, or (2) through circumstantial evidence under the three-step, burden-shifting scheme set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  For the first method, an employee may utilize "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 391 (4th Cir. 2001) (internal quotation

13

omitted), *cert. denied*, 535 U.S. 933 (2002).  In order to overcome a summary judgment motion based upon this method of proof, the plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Id.* (internal quotation omitted).  More specifically, the plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Id.* at 391-92 (internal quotation omitted).  If such evidence is lacking, the plaintiff nevertheless may proceed under *McDonnell Douglas*.  *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Under the *McDonnell Douglas* framework, the plaintiff first must establish a *prima facie* case of discrimination.  *See McDonnell Douglas Corp.*, 411 U.S. at 802.  Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse employment action alleged.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  If the defendant succeeds in doing so, that will rebut the presumption of discrimination raised by the plaintiff's *prima facie* case.  *See Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000) (citing *Burdine*, 450 U.S. at 255 n.10).  The plaintiff

14

then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.   In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her."   *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).

Plaintiff's complaint alleges two types of race-based discrimination: (1) discriminatory discharge with respect to his termination and (2) discrimination with respect to denial of opportunities.

## A. Plaintiff's Termination

Plaintiff argues he was fired to due to his race (paper 24, at 5) and in retaliation for complaining to Defendant's managers about his sales assignments (paper 24, at 9).

## 1. Plaintiff's Firing Due to His Race

Plaintiff asserts he has direct evidence of discriminatory intent regarding his termination.  (Paper 24, at 3).  The evidence includes Mr. DeCesaris' statement to Plaintiff that "you know those people.  You sold that kind of community before;" the incident in which Mr. DeCesaris asked Plaintiff to make coffee in front of other employees; the fact that Mr. DeCesaris supported Ms. Peck and had a condescending manner during their meeting; Ms. Peck's decision to assign Plaintiff to minority areas to sell homes; Ms.

Peck's decision to assign more lucrative communities to Caucasian community sales managers; unequal treatment with respect to the raiding of customers, splitting commissions, using lock boxes, and offering certain incentives and sales prices; and an income discrepancy between Plaintiff and Mr. Martin.

None of Plaintiff's evidence bears directly on Plaintiff's termination.  First, Plaintiff points to Mr. DeCesaris' comment that Plaintiff "knows those people."  However, this single remark is unrelated to Mr. DeCesaris' decision to fire Plaintiff.  *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated and '[u]nless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of [discrimination].'" (quoting *McCarthy v. Kemper Life Ins. Cos*., 924 F.2d 683, 686 (7th Cir. 1991))).  Second, many of the incidents Plaintiff relies on (e.g., the raid of Plaintiff's customers, the commission splits, the use of lock boxes, incidents at Winterset) occurred more than two years before Plaintiff's termination and Plaintiff has presented no evidence connecting these incidents to Defendant's decision to fire him.  *See Brinkley,* 180 F.3d at 608-09.

There are two ways to analyze Plaintiff's claim of discriminatory discharge based on race and/or retaliation.  First, if Plaintiff was treated more harshly than others outside his

protected class for comparable misconduct, the disciplinary termination could be discriminatory. Second, the termination could be discriminatory if Defendant's purported reason (that Plaintiff allegedly made threats) was mere pretext for intentional discrimination based on race or retaliation. Based on the evidence Plaintiff has provided, Plaintiff has proffered insufficient facts to support either theory.

### a. Discriminatory Discipline

To establish a *prima facie* case of discriminatory discipline under *McDonald Douglas*, the plaintiff must show "(1) he is a member of a protected class; (2) he was qualified for his job and his performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances." *Bryant v. Bell Atlantic Md.*, 288 F.3d 124, 133 (4th Cir. 2002). Plaintiff has presented no evidence whatsoever regarding the discipline of other employees who engaged in conduct similar to the threats he allegedly made, and therefore he cannot establish a *prima facie* case of discriminatory discipline.

### b. Discriminatory Discharge

To establish a *prima facie* case of intentional discrimination based on race under *McDonnell Douglas*, the plaintiff must show: (1) he is a member of a protected class; (2) he suffered from an adverse employment action; (3) when the employer took the adverse

17

employment action, the plaintiff was performing at a level that met his employer's legitimate expectations; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004); *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

Plaintiff can establish a *prima facie* case. First, Plaintiff, an African-American male, is a member of a protected class. Second, Plaintiff suffered an adverse employment action when he was fired. Third, Plaintiff presented his last evaluation, dated September 25, 2003, a month before his firing, in which he received satisfactory marks. (Paper 24, ex. 7). Fourth, Plaintiff was replaced by a Caucasian male, Mr. Martin. (Paper 14, ex. 4, ¶ 9).

Defendant has presented a legitimate, nondiscriminatory reason for firing Plaintiff. Defendant asserts that the termination decision was based on Defendant's belief that Plaintiff had threatened Ms. Peck. (Paper 14, exs. 4-8). Defendant has met its burden of production, and therefore the "presumption of discrimination 'drops out of the picture.'" *Reeves*, 530 U.S. at 143 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08 (1993)). Plaintiff must then prove by a preponderance of the evidence that Defendant's proffered reason is not its true reason, but instead a pretext for discrimination. *Burdine*, 450 U.S. at 253.

In *Reeves*, the Supreme Court clarified the plaintiff's burden at this stage. *Reeves*, 530 U.S. at 146-47. The court stated:

> The factfinder's rejection of the [defendant's] legitimate nondiscriminatory reason for its action does not *compel* judgment for the plaintiff. [*Hicks*,] 509 U.S., at 511, 113 S.Ct. 2742. The ultimate question is whether the [defendant] intentionally discriminated, and proof that "the [defendant's] proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that plaintiff's proffered reason . . . is correct." *Id*. at 524, 113 S.Ct. 2742. In other words, "[i]t is not enough . . . to *disbelieve* the [defendant]; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id*. at 519, 113 S.Ct. 2742.

*Reeves*, 530 U.S. at 146-47 (emphasis in original). The Court noted that in some cases it may be *permissible* to infer discrimination from the falsity of the defendant's reason. *Id*. at 147. In those cases, if a plaintiff produces evidence sufficient to establish a *prima facie* case and that the defendant's legitimate nondiscriminatory reason is false, the plaintiff may not be *required* to present additional evidence of discrimination in order to withstand summary judgment. *See id*. The court nevertheless emphasized that this sort of showing by a plaintiff *may not always* be adequate. The court stated: "Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's

explanation, no rational factfinder could conclude that the action was discriminatory." *Id*. at 148.

Plaintiff argues that Defendant's reason is pretextual because Plaintiff denied threatening Ms. Peck. In addition, when Defendant reported Plaintiff's unemployment to state officials, Defendant cited "lack of work" as the reason. (Paper 24, ex. 6). Plaintiff asserts that the threat allegations were "manufactured by defendant" to cover up Defendant's discriminatory conduct. (Paper 24, at 8). Finally, Plaintiff points out that Defendant never interviewed Plaintiff about the alleged threats.

Even if Plaintiff did not threaten Ms. Peck, which the court must accept for purposes of this motion, Plaintiff has come forward with no evidence to show that Mr. DeCesaris did not believe Plaintiff had made threats when Mr. DeCesaris decided to fire Plaintiff. *See Connor v. Giant Food, Inc.,* 187 F.Supp.2d 494, 498 (D.Md. 2002) (stating that even though the plaintiff denied threatening his manager, "he presents no evidence that Giant did not actually believe the threats had taken place"); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998) (stating that "[t]he uncontested evidence establishes that Morris honestly believed that [the plaintiff] deserved to be discharged"). Although Defendant told state officials that Plaintiff was fired due to "lack of work," this inconsistency "does not necessarily

establish that the plaintiff's proffered reason . . . is correct."[8]
*Reeves*, 530 U.S. at 146-47.  Plaintiff must assert facts to show
that Defendant had a discriminatory intent.  Plaintiff alleges that
Defendant manufactured the threat allegations to cover up
Defendant's discriminatory conduct, but cites no evidence in the
record to support this assertion.  Plaintiff's final point, that
Defendant fired Plaintiff without interviewing him first about the
allegations, does not lead to an inference of discrimination.
Because Plaintiff has not provided sufficient evidence to
demonstrate that Defendant's stated reason for his firing was a
pretext for discrimination, the court will grant summary judgment
to Defendant on Plaintiff's claim that he was fired due to his
race.

### 2. Retaliatory Firing

Plaintiff contends that he was fired in retaliation for
complaining to Ms. Peck, Mr. Kaplan, Mr. DeCesaris, and Ms.
Leftrict about disparate treatment in his sales assignments.
(Paper 24, at 9).  Defendant responds that it fired Plaintiff
because he threatened Ms. Peck.  (Paper 15, at 20).

To state a *prima facie* case of retaliation, the plaintiff must
show (1) the plaintiff engaged in a protected activity; (2) the

---

[8] Ms. Leftrict stated in a supplemental affidavit that she
decided not to enter a "gross misconduct" disqualifying entry on
Plaintiff's application for unemployment compensation because of
the circumstances of his termination.  (Paper 22, ex. 1).

employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to that adverse action. *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997).  With respect to the third element, "the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity."  *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).  Thus, "the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of a prima facie case."  *Id.*  Courts also look to the length of time between the employer's awareness of the protected activity and the alleged adverse employment action. *See, e.g., Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (stating that a thirteen-month lapse negated any inference of a causal connection); *Dowe*, 145 F.3d at 657 (finding no retaliation where there was a three-year time lapse).

Plaintiff can show the first two prongs that he had engaged in a protected activity by complaining about disparate treatment and that Defendant took an adverse action by firing Plaintiff. Regarding the third element, the record is unclear as to whether Mr. DeCesaris knew Plaintiff had complained of racial discrimination.  Defendant argues that when Plaintiff met with Mr. DeCesaris to discuss the Hamlin Park assignment, Plaintiff did not discuss the issue of race.  Even if Mr. DeCesaris was not aware of

Plaintiff's complaint based on this meeting, another portion of Plaintiff's testimony indicates that Mr. DeCesaris may have known.[9] Viewing this evidence in the light most favorable to Plaintiff, the court will assume that Mr. DeCesaris was aware of Plaintiff's discrimination complaints.  Plaintiff was terminated two months after he complained to Mr. Kaplan and a month and a half after his meeting with Mr. DeCesaris.

Defendant has rebutted the presumption of retaliation by stating that Plaintiff was fired because Mr. DeCesaris believed he threatened Ms. Peck's life.  In response, Plaintiff asserts that he did not make any threats, and that the real reason was retaliation for his complaints.  In support, Plaintiff asserts: (1) he was not fired until he complained to management; (2) nothing in the record shows that Plaintiff had been a "problem employee" or had assaulted others before Defendant fired him; and (3) Ms. Leftrict conducted her investigation into the alleged threats without Mr. DeCesaris' approval, which was against company policy.[10]  (Paper 24, at 9-10).

---

[9]  Plaintiff testified that Ms. Leftrict had told him that "Ed Kaplan with Didi Peck stormed her office to get information out of her so they could strategize.  She said she told Hugo DeCesaris and Didi Peck that if I was to go to any lawyer outside the company, they better handle this, because they would see this as racial discrimination."  (Paper 14, ex. 1, Holland dep., 150).

[10] For the third assertion, Plaintiff relies on Defendant's Associate Manual.  However, the manual does not support Plaintiff's assertion that Ms. Leftrict conducted the investigation improperly by not notifying Mr. DeCesaris.  In any event, it is unclear what this assertion has to do with Plaintiff's retaliation claim.

Accepting Plaintiff's contentions as true for purposes of this motion, Plaintiff has not produced sufficient evidence to show he was discharged in retaliation for his complaint. First, Plaintiff relies on the timing of his discharge – the fact that Defendant did not fire Plaintiff until after he complained in early September about racial discrimination. This fact, taken alone, is not sufficient to show Defendant fired Plaintiff because of his complaint and not because Defendant believed he had made threats. In fact, the timing of Plaintiff's termination – about a week after Ms. Leftrict began investigating possible threats – more directly supports Defendant's position. Plaintiff also appears to argue that Defendant's reason for termination cannot be believed because there were no prior allegations of Plaintiff making threats. However, the court will not second-guess Defendant's decision to fire Plaintiff under these circumstances. *Beall,* 130 F.3d at 620 ("Without evidence of pretext for retaliation, this Court will not act as a superpersonnel department that reexamines an entity's business decisions" (internal quotation marks omitted)); *see also Tinsley*, 155 F.3d at 444 ("[T]he fact that [the plaintiff] had a good track record *before* she worked for Morris does not establish that Morris's criticisms of [the plaintiff's] later performance were false or that the real reason for Morris firing [the plaintiff] was retaliation."). Plaintiff simply has provided no evidence that Defendant engaged in retaliatory conduct, for

instance, by providing evidence that Defendant's managers harbored animus toward Plaintiff because he had complained of racial discrimination. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 249 (4th Cir. 2000) (observing that the plaintiff "advances no evidence . . . that Hutto or anyone else at First Union harbored animus against her for complaining about Scoggins or for filing a Complaint with the EEOC"). Accordingly, Plaintiff has failed to demonstrate that Defendant's proffered reason was mere pretext for retaliation, and the court will grant summary judgment on Plaintiff's claim that he was fired in retaliation for complaining about racial discrimination.

## B. Denial of Opportunity Due to Race

Plaintiff alleges that due to his race he was denied benefits that Caucasian community sales managers received, including lucrative commissions, advancement, incentives, and training. (Paper 1, at ¶ 21). Defendant contends Plaintiff suffered no adverse job action when it assigned Plaintiff to Hamlin Park in September 2003 and that Plaintiff's remaining claims regarding commissions, incentives, and training are statutorily time barred. (Paper 15, at 21, 25).

## 1. The Decision to Transfer Plaintiff to Hamlin Park

Defendant asserts that Plaintiff's assignment to Hamlin Park was not an adverse employment action. Whether the plaintiff has direct or indirect evidence of discrimination, "the existence of

some adverse employment action is required." *Sterling v. Tenent,* 416 F.3d 338, 345 (4th Cir. 2005) (quoting *James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 375 (4th Cir. 2004)).  The Fourth Circuit has defined an adverse employment action as "a discriminatory act which adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *Booz-Allen*, 368 F.3d at 375 (quoting *Von Guten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001) (internal quotation marks omitted)).  In *Booz-Allen*, the court addressed the issue of job reassignments in detail:

> The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action. *Von Guten*, 243 F.3d at 868.  A "reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999).  "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Id.* at 256-57; *see also Taylor v. Virginia Dep't of Corrs.*, 177 F.Supp.2d 497, 504-05 (E.D.Va. 2001).

*Id.* at 376.

In *Booze-Allen*, the plaintiff was an African-American male who worked for the defendant Booze-Allen & Hamilton, Inc., as a project manager for the company's contract with the Washington Metropolitan Area Transit Authority ("WMTA").  *Booz-Allen*, 368 F.3d at 372-73. Due to conflicts with the client, the defendant reassigned the

plaintiff to a job that allowed him to focus on his pre-existing marketing and business development duties, but he was no longer in a managerial role.  He continued to work as a staff member on the WMTA contract.  *Id.* at 374.

In order to determine whether the plaintiff had suffered a "significant detrimental effect" on his opportunities for promotion and professional development, the Fourth Circuit considered whether there was "a decrease in compensation, job title, level of responsibility, or opportunity for promotion."  *Booz-Allen*, 368 F.3d at 376 (quoting *Boone*, 178 F.3d at 256).  The Fourth Circuit agreed with the district court that the plaintiff continued to receive the same pay, benefits, and other employment terms and conditions.  The court concluded that:

> [A]n employee's dissatisfaction with this or that aspect of work does not mean an employer has committed an actionable adverse action. And speculation about the future adverse consequences of a reassignment may not rise to the level of a genuine dispute.  Inasmuch as James departed the company before he even came up for a promotion, we are left to guesswork and conjecture as to what his prospects would have been.  James' speculations about the impact of his reassignment on his opportunity for professional development are merely that – stark assertions that are not sufficient to survive summary judgment.

*Id.* at 377.

Here, there is no evidence that Plaintiff's income changed as a result of the assignment, or that his responsibilities, position, or title changed.  Although Plaintiff questions the method Ms. Peck

used for making assignments,[11] he has not directly addressed Defendant's assertion that the Hamlin Park assignment was not an adverse employment action that affected the terms, conditions or benefits of his employment.  Presumably, Plaintiff believes the assignment was less favorable because selling homes at Hamlin Park would be difficult.  In his deposition, Plaintiff described the community as "blighted" (paper 14, ex. 1, Holland dep., 140) and stated that the community was not ready or open, *id.* at 140-41.  He also expressed concern that the starting price of the homes – $200,000 – was too high for the community, *id.* at 168, and he questioned the adequacy of the incentive package, *id.* at 170.  Plaintiff has not, however, proffered any evidence to support these opinions.  For instance, Plaintiff has provided no information on where the neighborhood is or the type of home being sold, or provided support for his assertion that the neighborhood was priced higher than the surrounding community.  Plaintiff's contention that working in Hamlin Park would have depressed his income is

---

[11] Plaintiff claims that he was told the factors Ms. Peck used included education and performance.  (Paper 14, ex. 1, Holland dep., 36).  At one point, Ms. Peck also told him that the first person done with a project automatically got the next project no matter what the assignment was or where it was.  *Id.* at 37-38.  Because Plaintiff cannot show that he suffered an adverse employment action, the question of how Ms. Peck made assignment decisions (i.e. whether the decision was based on education and performance, or whether the decision was based on who finished a project) becomes an immaterial fact.

conjecture that is insufficient to survive summary judgment.  *See*
*Booz-Allen*, 368 F.3d at 377.

### 2. Time Bar

Defendant asserts that the remaining events upon which
Plaintiff sues are time barred because they occurred more than 300
days before Plaintiff filed his EEOC charge.  Plaintiff filed his
EEOC charge on May 4, 2004.  Based on Defendant's argument, events
occurring before July 9, 2003, are time barred.  They include: (1)
incidents involving split commissions, denial of lock boxes, and
efforts to raid Plaintiff's customers; (2) assignments before July
2003; (3) restrictions on lots Plaintiff could sell; (4) incidents
involving sales incentives; (5) increases in home sale prices to
depress Plaintiff's sales; (6) denial of a contest trip in 2001;
and (7) denial of the CSP designation on his business card in 2002.
(Paper 15, at 25-26).  Plaintiff argues that because he was denied
favorable assignments and other opportunities throughout his
employment with Defendant, Plaintiff's claims are not statutorily
time barred because the incidents constitute a continuing
violation.

To pursue a Title VII claim, Plaintiff "must have filed a
complaint with the EEOC within 180 days of the incident or within
300 days of the incident if state or local proceedings are
initiated." *Beall*, 130 F.3d at 620 (citing 42 U.S.C. § 2000e-
5(e)(1)).  Incidents that occurred beyond these deadlines are time

barred unless they are related to a timely incident as a "'series of separate but related acts' amounting to a continuing violation." *Beall*, 130 F.3d at 620 (quoting *Jenkins v. Home Ins. Co.*, 635 F.2d 310, 312 (4th Cir. 1980)).

Assuming *arguendo* that each incident Plaintiff relies on is related, "the court must first conclude that there was a *present* violation." *Tinsley*, 155 F.3d at 442.   In *Hill v. AT&T Techs., Inc.*, the Fourth Circuit stated that:

> [T]he "critical question" in every discrimination case, whether there is a charge of "continuing violation" or not, is "whether any present violation exists" and not "merely continuity," "present violation" being one occurring within 180 days of the filing of a charge on account of such violation with the EEOC. . . . [W]e had occasion recently to examine this continuing violation theory and we held that in order to apply this theory that there must be a "present violation" within the required time period. *Woodward v. Lehman*, 717 F.2d 909, 914-15 (4th Cir. 1983). In that case we said: "It is only where an actual violation has occurred within that requisite time period [i.e, within the period of 180 days before the filing of a charge with the EEOC] that under any possible circumstances the theory of continuing violation is sustainable."

731 F.2d 175, 180 (4th Cir. 1984) (internal citation omitted).

To assert his continuing violations theory, Plaintiff relies on several cases.   *See, e.g., Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396 (1st Cir. 1990);   *Chung v. Pomona Valley Cmty. Hosp.*, 667 F.2d 788 (9th Cir. 1982); *Jenkins v. Home Ins.* Co., 635 F.2d 310 (4th Cir. 1980); and *Elliott v. Sperry*

*Rand Corp.*, 79 F.R.D. 580 (D.Minn. 1978).   The cases Plaintiff cites are consistent with the Fourth Circuit's position.   *See Sabree*, 921 F.2d at 400 ("In order for the violation to be actionable, at least one act in the series must fall within the limitations period."); *Elliott*, 79 F.R.D. at 585 ("An employee may challenge a series of events, all of which are alleged to have been discriminatory, but only one of which occurred within the relevant time period."   Plaintiff's own argument recognizes this rule when he states that "*although there must be a discriminatory act within the charge-filing period*, if the serial violations are adequately related, each is actionable . . . ."   (Paper 24, at 16) (emphasis added).

Plaintiff's assignment to Hamlin Park is the only claim within the 300-day time limit.[12]   Because Plaintiff has failed to provide sufficient evidence to withstand summary judgment on that claim, Plaintiff's remaining claims regarding denial of opportunities occurring before July 2003 are time barred.[13]

---

[12] Plaintiff asserts that he has other incidents within the 300 days, including being moved to another location "with little or nothing to do" and his transfer to another location at his work site.   (Paper 24, at 12).   However, the court cannot determine the dates on which these events occurred because Plaintiff has neither provided dates nor provided citations to the record.

[13] In light of the foregoing, the court need not address Defendant's argument that the incidents are discrete separate events and therefore are not subject to the continuing violation theory.

### 3. Denial of Opportunity Due to Pattern or Practice

Plaintiff alleges in his complaint that Defendant has an "institutionalized policy" under which Caucasian community sales managers received opportunities that he did not receive. (Paper 1, at ¶ 21). The allegation is based on the "*system* of providing Caucasian sales managers assignments in premium locations" (emphasis in original), and the creation of programs for communities assigned to Caucasian sales managers "to effectuate an accelerated sales pace and higher commissions, thereby deliberately depressing the earnings of the plaintiff and diminishing his sales status." (Paper 24, at 10-11).

It is unclear whether Plaintiff seeks to bring a pattern or practice claim, or whether he seeks to invoke pattern or practice to support his burden of proof under *McDonnell Douglas*. To the extent that plaintiff seeks to bring a separate claim, the Fourth Circuit has held that "individuals do not have a private, non-class cause of action for pattern or practice discrimination under § 1981 or Title VII." *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 759 (4th Cir. 1998). *See also Williams v. Giant Food Inc.*, 370 F.3d 423, 430 n.3 (4th Cir. 2004) ("*Lowery* . . . held that an individual plaintiff (as opposed to a class action plaintiff) cannot pursue a cause of action based on a pattern or practice of discrimination or invoke the proof scheme described in *International Brotherhood of Teamsters v. United States* . . . ." (internal citation omitted)). In the alternative, to the extent that Plaintiff seeks to use

32

pattern or practice to support his burden under *McDonnell Douglas*, as discussed previously, Plaintiff's argument cannot succeed because he cannot show a present violation within the statute of limitations.

## V.  Motions to Strike

Defendant filed three motions to strike various papers submitted by Plaintiff: first, Defendant received a paper on or about May 25, 2005, styled Amended Answer, but no such paper was ever filed with the court.  Accordingly, that motion, paper 29, is denied as moot.   Second, Defendant moved in paper 30 to strike Plaintiff's reply, which is paper 27.   The court already disabled the link to paper 27, *see* entry 28, so this motion is also moot. Finally, Defendant moves in paper 34 to strike Plaintiff's response in paper 33, as an unpermitted surreply.   Plaintiff opposes this motion, reciting that paper 33 is merely a legible, electronic version of earlier papers.   The court has referred to paper 24 as Plaintiff's opposition to the motion for summary judgment, and has no need to refer to paper 33.   Accordingly, Defendant's motion to strike paper 33 is granted.

## VI. Conclusion

For the reasons stated, the court will grant Defendant's motion for summary judgment, deny Plaintiff's motion to extend the discovery deadline, deny Plaintiff's motion for leave to file an

amended complaint, and deny Defendant's two of motions to strike as moot, but grant the third. A separate Order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge